Case number 25-3333 Appalachian Voices et al. Appellants Institute for Sustainable Communities versus Environmental Protection Agency and Lee M. Zeldin in its official capacity as Administrator of the United States Environmental Protection Agency. Mr. Grillo for the appellants and Mr. Bailey for the appellants. Good morning council. I think it's still morning, barely. Mr. Grillo, please proceed when you're ready. Good morning, your honor, just barely. May it please the court, my name is Benjamin Grillo and I'm representing the appellants in this matter. I'd like to reserve 2 minutes for rebuttal. Thank you. This case squarely challenges the elimination of an entire congressionally mandated grant program for policy reasons. Plaintiffs properly pled both APA and constitutional claims in the district court, challenging that elimination. This court should reverse the district court's decision to dismiss the claims and remand for the proceedings. Now, this court has recently been presented with similar issues, and we recognize that the outcome of this case may, to some extent, be guided by this court's forthcoming ombud decisions in Climate United and in TEU. However, this case is distinct. First, Congress created a mandatory grant program. It said EPA shall award $3 billion in grants. Second, plaintiffs pledged facts, demonstrating that the executive decided to eliminate the entire program on the program level. And third, the statutory command remains in effect. The statute has not been repealed. And further, unlike other cases which have come up on preliminary relief, this case is here on a motion to dismiss. And plaintiffs have pled plausible APA and constitutional claims, and they should be heard in the district court. Now, first, this case is not moot. The statutory language here in H.R. 1, which defendants point to, is clear. It rescinded only unobligated balances. Now, unobligated balances is a term of art in the fiscal law, and it is designed to provide certainty to the government. The OMB circular that the government cited in their brief, a few pages later, describes in detail just why unobligated balances are limited to certain terms. Can you just address specifically why do the termination letters, standing alone, in your view, make these funds, I guess, not unobligated? Or why is the termination letter not sufficient to unobligate the funds? Certainly, the termination letters themselves, if you look at the language of the letter, not only does it identify that it provides notice, which is the first step of a termination process. So, the termination letter initiates a termination process, and EPA's regulations set out, as part of that process, two important things. First, an appeal. So, the notification in the letter includes the opportunity for the grantee to notify EPA that they disagree with the termination decision and to have an appeal. That, in itself, does not create some uncertainty about whether those funds are, in fact, obligated or deobligated. So, that alone creates sufficient reason for why these funds were not unobligated. And the second reason is that, as EPA explains, there's a final financial report that needs to be submitted. And that report is an accounting by which the grantee then identifies what's outstanding. EPA goes back and forth with them. And only once that amount is set, do the funds become unobligated. And that's— Do you have any precedent for suggesting—so, the government has conceded that costs that were incurred before termination and any closeout costs will be paid to the grantees. And everything beyond that, although it may not be fully determined or fleshed out, is no longer obligated. So, the amount hasn't been set through the various processes. But does that—I mean, I don't know why that would necessarily mean that those funds continue to be obligated. So, Your Honor, if you look at the OMB circular that the government cites, A11, and you go to page 27, in the context of a maximum price contract, it makes the assertion that, as a general rule, the amount of obligation is the maximum liability to the federal government. That's what's set at the time of obligation. So, let's say you have a maximum price contract, and perhaps there's a downward adjustment. Perhaps the vendor is able to provide it at a lower cost, and that maximum price contract needs to be adjusted. Only once that downward adjustment is written down and there is, quote, documentary evidence that the price is reduced, only at that point does the delta become deobligated. So, there needs to be some certainty, because otherwise you could run into an Antideficiency Act problem relatively quickly if you consider everything deobligated and the actual amount that was owed was more than that. You've created a liability without an obligation. So, the way that the financial system works is to keep funds obligated until they become final. It makes sense as a general matter with respect to the Antideficiency Act, but here Congress has specifically rescinded, and so we also have to give meaning to what happened in the OBBBA. So, what H.R. 1 did and what Congress did is they rescinded unobligated balances, and this background understanding of fiscal law certainly was present, and it's understood that when asked, the chair of the Environment Committee, Representative Griffiths, stated in response to a question about what does this do to the grants that EPA has started the termination process on. So, in response to that question, he answered, as of right now, that money is not available to us because it has been obligated, and he recognized, and we do not dispute, that a future act of Congress. One member of Congress. process deobligation until the final financial report is completed. This matches EPA's regulations. It matches this background understanding of financial law. It matches what— Which is after the closeout process, right? After the closeout process and after the appeal process. Those two work together, and as counsel for EPA stated in the en banc argument a few weeks ago, funds are not technically deobligated until the closeout process is completed, and technicalities matter here, and this is a matter of how this accounting worked. So, what Congress did, as reflected in the CBO score in July of 2025, was rescinded the balances that were unobligated on that day, which was $516 million, not the entirety of the entire grant program, and the rest of those funds remain, and importantly, Congress did not repeal the statute. So, that statutory obligation remains, and EPA is still required to comply with the effectuation of the program. Can I ask you—so, suppose that we accept your submission on mootness, so that the dispute is not moot, just assume for purposes of this question that we get past the mootness, then is there—and you can't obviously know what's going to happen in NTU and Climate United, but do you have a reason that no matter what happens in those cases, we should still reach a conclusion in this case, or the natural course would be that those cases have—you acknowledge, and I think everybody acknowledges some overlap, and the natural course would be to see what happens in those cases when those opinions are issued and then reach a conclusion as to how that affects this case? I see two paths there, Your Honor. I think it may make sense as a matter of judicial economy to wait on this case until those are decided and then rule. I also think that it would be appropriate to send it to the district court because we have stated a claim under a motion to dismiss standard and then allow the district court to apply whatever decisions reached in NTU and Climate United. But in either case, we have sufficiently met the pleading standard, and I think taking inferences, accepting our facts as pled, we have stated a claim for the elimination of this entire grant program. So even if we went back to the district court, the district court wouldn't do anything until the unbanked decisions were issued. Is that the scenario you're hypothesizing, or are you hypothesizing something different? So for the APA claims, I believe that the district court could rule now regardless of what happens in NTU and Climate United because of the distinctions and the ways that our case is different. The district court reached its constitutional conclusions in large part relying upon the adult analysis that's squarely presented in NTU and Climate United, so I would agree that the district court would not be prudent for it to rule on that at that point. And then can I ask you about the timeline and the appropriation? So the appropriation law says that the funds remain available until September 30, 2026. Yes, sir. So that's coming up later this year? Yes, sir. So the question becomes, what effect does that date have on the future litigation of this case if, in fact, it continues? So that's a question for the defendants, Your Honor. That's a question for the government as to how they intend to carry out their mandate here to effectuate. But what's your view about that? I mean, you must – you're a part of the district directly affected by whatever the effect of that date would be. So EPA would be required to, in our view, obligate the funds by September 30, 2026. Whether they obligate them to our specific plaintiffs, whether they recompete for them in some new process, perhaps an expedited process, that is a question that needs to be squarely presented to the defendants. And our requirement would be that they, in fact, effectuate the program. But we're not – I don't want to prejudge the outcome of what that would look like or what we would agree to. So what – suppose, for example, that this case – that this case remains in suspended animation past September 30, 2026, just where it is right now? Yes, Your Honor. Just suppose that happens. Then what – in your view, what's the effect of the September 30th date having – There's certainly case law in this circuit that under CASTLE and other doctrines that as long as our case was filed before the lapse in appropriations deadline that the litigation can continue and the court has inherent equitable power as to whether and how to proceed in that context. We're not there right now. But in our view, if this proceeded past that date, that's certainly an argument we would make. That's the line of cases that you'd be drawing on? Yes, Your Honor. The district court. If the district court reached the merits of your constitutional claim before addressing standing or mootness, would it make sense under Steele Co. to send it back to the district court for the district court to address that first? If this court has questions about standing and mootness as a factual matter, then it's appropriate for the district court to evaluate those. We have strong arguments as the complaint read in our favor, accepting it is true that we have established both standing and mootness. It's not moot, but that outcome is understood. So the grantees press their claims under 706-2, right, that the so-called shutdown is contrary to law. But I'm wondering whether we should think about the claims more like 706-1 claims for, well, am I mixing that up? I think you have it right. You have it right, Your Honor. Okay, sorry. For agency action, I'm awfully withheld. Right, so. The withheld action is grantees want EPA to continue to provide this grant program. What EPA has done, what the heart of our 706-2 argument is, is that they have decided that they are not going to effectuate a grant program. So they made a directive, and it was a decision that they were, for policy reasons, going to eliminate the entire program. And so as an initial matter, what that looked like was the termination of the individual grants, but it has also resulted in the failure to award new grants. They make no effort to suggest to this court that they intend to do that. So why is that not 706-1? So. Seeking to compel EPA to run a grant program that you say Congress requires, that's legally required. They say, our position is that they took an action, and under 706-2 we can vacate and set aside that action. It was unlawful for them to take this action. And then as a result, the statutory mandate of 138 is incumbent upon them. And if at that point they fail to follow the law, then that's a 706-1. But we brought a 706-2 because they took a discreet action here. Where's the discreet action, right? So in NIH, the Supreme Court's state opinion in NIH, there was a separate guidance document that set out a policy. Here there is a series of actions to terminate grants. So here there's an underlying discreet policy decision that was made in February of 2025 that was delivered verbally by Deputy Administrator Voiles to his subordinate Daniel Coogan, and it was memorialized in email and said, I want you to eliminate these programs that I have identified by assistance number listing. Assistance number listing is the EPA database for the entire program. This is not talking about individual grants. It's an elimination of an entire program going forward. And then that chain of events was attested to in a declaration that was produced in federal court in response to a judge's question saying, what happened? And so that action is sufficiently meets the hallmarks of universal spirit. And certainly reading the facts and the complaint in our favor, we have certainly pled a final agency action for the purposes of a motion to dismiss. Okay. Make sure my colleagues don't have additional questions at this point. Have you a little time for rebuttal? Mr. Bailey. Good morning, Your Honors. John Bailey for the United States. May it please the court. This court can affirm on either of two threshold grounds. First, this case is moot. After EPA terminated these grant agreements, Congress expressly rescinded the unobligated funds appropriated for environmental and climate justice block grants. Upon termination, the only remaining legal obligations were for allowable pre-termination and closeout costs, which EPA has already agreed to reimburse. The balance of plaintiff's awards, along with any other uncommitted funds that might be used to prospectively fund the various programs, were pulled back by Congress in the one big beautiful bill. Mr.  what is your best evidence for the fact that a termination letter standing alone, you know, makes these de-obligates the grant funds? Sure, Your Honor. Because the government hasn't offered any other evidence of what's happened with these funds in terms of moving towards de-obligation. You're correct. Our position is that it is the fact of termination, the action of termination that in this context makes the funds an unobligated balance in the sense of HR 1. What is your support for that? I mean, you know, we're not budget law experts and there's very limited briefing that the government has offered to support this position. Understood, Your Honor. And we try to find the best authoritative textual sources. And for that, we point to the OMB circular, which defines an obligation as a legally binding agreement that will result in outlays immediately or in the future. And so we think of these agreements, those are the binding obligations that give rise to the obligation in the first instance. And so upon termination, when that legally binding agreement is no longer operative, at that point the funds become unobligated within the meaning of HR 1. What about the fact that those unobligated funds, so the grants are terminated and the government thinks, so the funds are unobligated, but agrees that costs that were incurred before termination and any closeout costs remain obligated. Correct, Your Honor. And so there's some uncertain amount of unobligated funds. I mean, because it hasn't been set. Does that matter for the purposes of budget authority? I don't think it does, Your Honor. I think that's right that at the moment of termination, because we haven't necessarily completed the reconciliation and closeout process, that the exact quantum of funds that remains obligated under the OMB regulations, it is indeterminate. But I don't think that means that Congress isn't able to rescind those  It used very specific language, unobligated balances. And I think part of. I think there's no doubt that they can rescind, but the question becomes when did they become unobligated? Did they become unobligated at the moment? I take it you don't think there's any difference between unobligated and de-obligated. It sounds to me like you're. I think there is a difference. Unfortunately, Your Honor, I think that the term. I don't know if it's unfortunate or fortunate, but I'm curious as to what your position is. I think that de-obligated is unhelpful because that's not a term that I understand to be defined in any regulations, regulatory materials. I think that's kind of a colloquial like agency speak for what happens at the end of reconciliation and closeout. Well, before I encountered this case, I heard of the term de-obligated, but I think we need to drill down on unobligated balance, the exact language in HR 1. And I think the best way to understand that is by looking to what obligation means. So not to complicate things. There's at least a colloquial understanding of what de-obligated is. At least, I mean, that word is used. It's handed about. And you think that the unobligated for statutory purposes predates de-obligation? Oh, I think unobligated for purposes of HR 1 looks at whether we have a legally binding agreement that's operative at the time of rescission. And so unless a court has, as maybe it may have been the case in some other cases before this court, unless a court has set aside that termination, vacated it, enjoined it, something like that, the state of the world, at the time of termination, the agency took an action. It has effects, practical and legal ones, until that's disturbed by, as I said, a court order or something, enjoining it, vacating it, setting aside, which we didn't have here. I think the question is whether that legal effect amounts to either a de-obligation or unobligation. And to the extent you think there's a difference and you appear to think there is, then whether that amounts to an unobligation, the termination alone, even though they're still working out yet to be done. Sure. And I think that we concede that it's at least you're factually indeterminate until at the end of closeout, those final financial reports need to be submitted. But I think as a functional matter, in addition to the textual reasons I just gave, I don't think it makes sense to say that, oh, well, Congress was only trying to rescind funds that were, you know, the reconciliation was completed and fast enough or in a certain amount of time. I don't know why that should matter. I think the question is whether the agency viewed these funds as still committed. And Congress said, well, if the agency has viewed these funds as committed to someone, we're not going to pull them back. We don't want to disturb what the agency is doing. But when the agency has uncommitted the funds, which our position is that termination uncommits them in the relevant sense, well, at that point, Congress said we're going to pull back funds that are uncommitted. And that was what the rescission was in HR 1. Mr. Bingley, can you point to any either court case or executive branch practice or regulation that suggests that the technical term, unobligated balances could be an indeterminate amount, right? Because usually when you talk about balances, that's a kind of accounting term of art suggests maybe that something like a balance has been determined, you know, specific amount of the balance. So I'm just wondering if there's anything you can point to that suggests you could have an unobligated balance in that technical sense that is not yet settled. I'm afraid I probably don't have a particularly satisfying answer for you, Judge Rao, but I do think that. Part of executive branch practice, that unobligated balances may sometimes not be determinate. I mean, I don't, I don't know. Well, I think this is related to the interplay between the recording act and the anti-deficiency act where agencies as a matter of practice are going to have sums over-recorded on their books while this reconciliation or closeout process plays out. And so for that reason, you might not look at a pot of money as de-obligated until the end of the process, but at least as a legal matter, those funds are uncommitted to as far as the agency's concerned, they just are trying to figure out the exact quantum that they need to. And so the rescission that Congress enacted of unobligated balances would apply to that indeterminate amount. Yes, Your Honor. I believe that as I said. You can't, you can't point to any either executive branch regulation or case that has that understanding. No, and I don't believe that my colleague on the other side is pointed to one that said that that would foreclose this reading. It's, it's, it's a tough textual question, but I mean, we have to, we have to ultimately reports. We'll have to answer what was Congress doing here and what exactly were they pulling back? And I don't think we can say, oh, well, it really wasn't doing anything because you know, it just wasn't clear what exactly who the money belonged to. I think Congress was really looking at where these funds committed to what agency committed these funds. And if so, we're not going to disturb that, but for the pot of money that is uncommitted is unobligated. We're going to pull that back. And I think that that doesn't turn necessarily on whether that quantum has, whether the 120 days has passed, that would allow final financial report to calculate that exact sum. And that's just a question along the same line. So the grant agreements themselves talk about re-obligation where there's been a de-obligation. Yes. And so is the way you understand the world that, that the language says de-obligate uncommitted funds and re-obligate them by an award to another grantee. And so the way you would understand the way these terms all get juxtaposed is that even though the re-obligation happens after the de-obligation of uncommitted funds, which requires the process that would unfold to identify the amount that would then be re-obligated, that an un-obligation has already occurred before any of that happens. I would say that an un-obligation occurs upon termination. And then I would say there's a closeout that allows the full or the determinate amount to be de-obligated as the agencies say. At that point, now the agencies know, okay, we're not going to violate the anti-deficiency act if we go ahead and re-obligate to a new grantee. So I see it as un-obligation at point of termination. We go through closeout and now agencies say we have de-obligation. Now we have an identifiable amount to re-obligate. I see. Un-obligation, then de-obligation, then re-obligation, is the way you would reconcile these various terms that are in the statute and in the grant instruments. Yes. And to my understanding, I don't think that de-obligation is a word that appears in other regulatory materials or statutory materials. That's why I think it's most helpful to hone in on obligation in the OMB regulations. It's in the grants, but I understand your point about the regulations in the statute. Yes, Your Honor. I think you may have just said this, but in normal situations when an agency terminates the contract, the agency is not able to instantly re-obligate some of those funds? I don't know. I think as a practical matter, I think yes. As a practical matter, they're not able to immediately re-obligate from that same pot of money because they don't yet know how much of that pot of money has to go to the initial grantee for allowable pre-termination and closeout costs. So as a practical matter, you need to allow the closeout process to play out. So I understand that de-obligation term to be like, well, now as a practical matter, we can go out and re-obligate. But at least for purposes of H01, I think the un-obligated versus obligated is going to come down to whether you have that legally binding agreement in effect. And then can I ask a question about, unless there's further questions along these lines, on the timing question raised with counsel on the other side. So what is the government's view about the effect of the September 30th, 2026 date on the litigation? And I'll just give you one scenario to hypothesize. I don't know. I can't know what the scenario is going to be. But suppose this case stays in its current status as of September 30th, 2026. At that time, what is the government's position on what happens to this case? Well, unfortunately, I think that does turn on whether a court agrees with EPA's understanding of un-obligated balance, because EPA's position right now is that there is just no money left, no money left that it may obligate to new grantees to which to run the  Understanding that other amounts are over-recorded for reasons we just talked about, closeout is still playing out. But EPA's position is that there is no more funds that could be re-obligated to new grantees or to new projects. So if EPA's position is right, we would say that that deadline is a nullity because either before or after it, there's no money left to draw from. Does that, and then I'm curious, of course, as to your thought if that argument doesn't carry the day. But before we go there, does that argument just collapse into the Moodness argument? In other words, or is there a delta? So does that acceptance of that argument would necessarily mean the case is Mood anyway? Or is there something else going? I mean, I think there could be a distinction, Your Honor. And one that I've thought of is, even if we say that the balance of plaintiff's awards were not rescinded. And so there's some money left available to the agency until at least this deadline. As you may have seen, the statute reserves 7% of funds for administrative costs. EPA's position is that those funds have all been pulled back. And so it's unclear how the program would necessarily operate prospectively going forward, even if you believe that the balance of plaintiff's awards still are still able to be obligated. So not necessarily mooting their one version of their claims. But yes, they are related.  And I think to the second part of your question, assuming there is some quantum of funds that is left around as we approach the September, 2026 deadline. I think at a certain point, we would probably appreciate being able to submit supplemental briefs on exactly what the right remedy or effect would be. At this point, it's hard to know exactly what our position would be once that deadline rolls around.  My colleagues don't have additional questions for you at this point. And of course, no further questions on my time, which I see I'm well out of. So thank you. Thank you. Counsel. We'll give you the two minutes you asked for for rebuttal. Thank you, Your Honor. At the outset, I want to point out that Congress can't rescind an unknown amount of money. So it had to be a finite fixed sum at the time of HR one. And it's important to have this finality funds are obligated until they're not. So calling it deobligation, calling it on obligation. It's can't be a Schrodinger's cat situation. Funds are either obligated or they're not. And for all the reasons that we've described, they were not unobligated balances at the time that HR one acted and to read HR one in the way that the government is suggesting here would essentially be a repeal by implication, because what it would do, what it would have done is have repealed all of section 138. And that didn't happen. The statute remains on the books today. What is your best authority for the fact that an unobligated balance has to be determinate or specified, that it can't be in the process of being determined and then rescinded? I think there's two, Your Honor. First is the OMB circular, which sets out that the amount of an obligation is the maximum liability and gives us example of a maximum price contract that then gets reduced. Secondly, even going to the letters, which is the only thing that the government points at for this assertion, there is, as recognized, an appeal process. And so in our view, the government has this process backwards. So the first thing that happens is a letter gets sent and that notifies the recipient of the termination. And that's 200.341 notification. 342 is the opportunity to object and have a hearing and contest the grounds for terminating the award. And so in a world in which it's possible that the hearing officer would decide that the termination was an error, it would be inappropriate for the obligation or an obligation to have occurred already. And then after 342. It just means that those funds wouldn't be an unobligated balance under the meaning of OBBB. Right. So this process was in play. But that doesn't tell me why when Congress used the term unobligated balance, it has to be a determinate amount. And not an amount that is like in process of being determined. So they want to say, you know, things that are unobligated are rescinded. That's what the statute says. Unless Congress acts the way the HR1 works or rescission bill works is that on the date that it passes, it looks at what's unobligated on that date. If it wanted to have a future effect, if it wanted to go to futurity, then it could have written something like that. But it didn't. It would have to use specific terminology. Like, for example, we're not going to allow raises going forward under this compensation statute. That would be a situation in which that would have future effects. This is a situation in which it is a snapshot in time of July 2025. And your view is it can't be unobligated unless the amount has been specified. And all the appeals have run out and the closeout process is finished. And that comports with both longstanding EPA practice, EPA regulations, EPA statements, statements of counsel and argument, the general background of the OMB circular, the red book, the nuances of fiscal law. You don't dispute that the funds become uncommitted on termination? I do dispute that, Your Honor. Because, A, there's first of all an appeal process. So it would not be appropriate for me to take my daughter's allowance unless I check with my wife first. And so there's an appeal process that works first. And then secondly, there's the closeout process about identifying the precise quantum. I do not dispute, however, that once the closeout process is finished and that accounting is done, that those remaining funds then become deobligated, unobligated, and become available to be awarded to some new grantee. I was trying to introduce a different term of uncommitted because counsel was using that term and it's in the grant agreements also. And you think uncommitted is the same as deobligated? For funds to be uncommitted, there needs to be some finality around it. And I think that what matters for this purpose is what Congress meant with unobligated balances. I'm also going to add in the fact that when H.R. 1 passed in July of 2025, there were still some grants that had not yet even been terminated, that didn't yet have a termination notice sent out for them. And certainly in that context, there's no question that H.R. 1 didn't affect them because they haven't even been notified. And what that does is it creates some redressability because those grant funds were certainly untouched by H.R. 1. And as a result, some quantum of funds regardless of the size that gives us an opportunity to compete is enough. Make sure my colleagues don't have additional questions. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Rao; Walker